# 21-1233

**IN THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT**

AMERICAN CIVIL LIBERTIES UNION IMMIGRANTS' RIGHTS PROJECT,

*Plaintiff-Appellant*,

v.

UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,

*Defendant-Appellee*.

*On Appeal from the United States District Court
for the Southern District of New York*

**BRIEF OF PLAINTIFF-APPELLANT AMERICAN CIVIL
LIBERTIES UNION IMMIGRANTS' RIGHTS PROJECT**

CODY WOFSY
American Civil Liberties Union
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
cwofsy@aclu.org

NOOR ZAFAR
MICHAEL TAN
American Civil Liberties Union
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
nzafar@aclu.org

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT .......................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................3

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...............3

   I.   The FOIA Request and ICE's Response .........................................3

   II. Statutory Background....................................................................11

   III. The District Court's Opinion .......................................................14

SUMMARY OF ARGUMENT ..............................................................15

STANDARD OF REVIEW ....................................................................17

ARGUMENT ........................................................................................17

  I. Relational Information is a "Record" Subject to Disclosure Under FOIA. .......17

    A. The Requested Relational Information Is An Existing Agency "Record"
       Under The E-FOIA Amendments. .........................................................18

    B.  Extracting Relational Information, Like Other Compilations And
       Arrangements Of Data Maintained in Agency Databases, Is Not Creation
       Of A "New Record."..................................................................................22

C. Producing Relational Information Does Not Require ICE To Conduct Additional Research Or Analysis. .................................................................26

II. FOIA Requires ICE to Segregate Nonexempt Relational Information from A-Numbers ...................................................................................................29

   A. The District Court's Refusal To Require Segregation Contravenes Settled FOIA Principles. ...........................................................................................30

   B. FOIA's Flexible Segregation Mandate Requires Use Of Unique IDs To Produce Relational Information .................................................................33

   C. Using Unique IDs To Segregate Relational Information Is Nearly Burden-Less, and Does Not Constitute Creation Of A New Record. ......................37

   D. The 2016 FOIA Improvement Act Placed An Additional Obligation On ICE To Take "Reasonable Steps" To Segregate Relational Information. ..........41

CONCLUSION ......................................................................................................46

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Dep't of Justice*,
  681 F.3d 61 (2d Cir. 2012) ...................................................................38

*Aguiar v. Drug Enf't Agency*,
  992 F.3d 1108 (D.C. Cir. 2021)................................................ 12, 22, 38

*Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*,
  830 F.3d 667 (D.C. Cir. 2016)......................................................... 30, 31

*Ayuda, Inc. v. Fed. Trade Comm'n*,
  70 F. Supp. 3d 247 (D.D.C. 2014).........................................................31

*BNSF Ry. Co. v. Loos*,
  139 S. Ct. 893 (2019).............................................................................43

*Cook v. Nat'l Archives & Recs. Admin.*,
  758 F.3d 168 (2d Cir. 2014) ..................................................................32

*Ctr. for Constitutional Rights v. CIA*,
  765 F.3d 161 (2d Cir. 2014) ..................................................................17

*Ctr. For Investigative Reporting v. U.S. Customs & Border Prot.*,
  436 F. Supp. 3d 90 (D.D.C. 2019).........................................................44

*Ctr. for Investigative Reporting v. United States Dep't of Just.*,
  982 F.3d 668 (9th Cir. 2020) ......................................................... passim

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976).......................................................................... 11, 45

*Disabled Officer's Ass'n v. Rumsfeld*,
  428 F. Supp. 454 (D.D.C. 1977)............................................................25

*Disabled Officer's Ass'n v. Rumsfeld*,
  574 F.2d 636 (D.C. Cir. 1978)................................................................25

*Env't Prot. Agency v. Mink*,
  410 U.S. 73 (1973)...........................................................................22

*Evans v. Fed. Bureau of Prisons*,
  951 F.3d 578 (D.C. Cir. 2020)................................................. 33, 34, 35

*Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco,*
  *Firearms & Explosives*, 403 F. Supp. 3d 343 (S.D.N.Y. 2019)........ 19, 25, 26, 40

*Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco,*
  *Firearms & Explosives,* 984 F.3d 30 (2d Cir. 2020) ..................................... 19, 26

*F.B.I. v. Abramson*,
  456 U.S. 615 (1982).........................................................................34

*Flightsafety Servs. Corp. v. Dep't of Lab.*,
  326 F.3d 607 (5th Cir. 2003) ...............................................................39

*Food Mktg. Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019).....................................................................19

*Grand Cent. P'ship, Inc. v. Cuomo*,
  166 F.3d 473 (2d Cir. 1999) .................................................... 12, 17, 18

*Hawkinson v. Immigr. & Customs Enf't.*,
  No. CV 20-10189-FDS, 2021 WL 3604845 (D. Mass. Aug. 12, 2021) ....... 34, 36

*Hopkins v. U.S. Dep't of Housing and Urban Dev.*,
  929 F.2d 81 (2d Cir. 1991) .................................................................31

*Johnson v. Exec. Off. for U.S. Att'ys*,
  310 F.3d 771 (D.C. Cir. 2002).............................................................31

iv

*Jud. Watch, Inc. v. U.S. Dep't of State*,
   No. 12-893 (JDB), 2017 WL 3913212 (D.D.C. Sept. 6, 2017)............................36

*Kuzma v. IRS*,
   821 F.2d 930 (2d Cir. 1987) ..................................................................41

*Lipton v. United States Env't Prot. Agency*,
   316 F. Supp. 3d 245 (D.D.C. 2018).................................................. 12, 38

*Long v. CIA*,
   No. 15-cv-1734, 2019 WL 4277362 (D.D.C. Sept. 10, 2019) ............................25

*Long v. United States Immigr. & Customs Enf't*,
   464 F. Supp. 3d 409 (D.D.C. 2020)....................................................31

*Long v. U.S. I.R.S.*,
   596 F.2d 362 (9th Cir. 1979) ................................................................37

*Long v. United States Immigr. & Customs Enf't*,
   No. 1:14-CV-0019-JDB (D.D.C. Oct. 9, 2014)......................................5

*Long v. United States Immigr. & Customs Enf't*,
   No. 5:17-cv-00506, 2020 WL 5994182 (N.D.N.Y. Oct. 9, 2020) ............... 20, 26

*Marx v. Gen. Revenue Corp.*,
   568 U.S. 371 (2013)...............................................................................44

*Mattachine Soc'y of Washington, D.C. v. United States Dep't of Just.*,
   267 F. Supp. 3d 218 (D.D.C. 2017).....................................................36

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
   566 F.2d 242 (D.C. Cir. 1977)............................................... 17, 31, 34

*N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*,
   987 F.3d 207 (2d Cir. 2021) ............................................................ 44, 45

*Nat'l Council of La Raza v. Dep't of Justice*,
    411 F.3d 350 (2d Cir. 2005) ...............................................................17

*Nat'l Sec. Couns. v. Cent. Intel. Agency*,
    898 F. Supp. 2d 233 (D.D.C. 2012)....................................................27

*Nat'l Sec. Couns. v. Cent. Intel. Agency*,
    969 F.3d 406 (D.C. Cir. 2020)...................................................... 27, 28

*Neufeld v. IRS*,
    646 F.2d 661 (D.C. Cir. 1981)............................................................32

*New York Times Co. v. United States Dep't of Justice*,
    939 F.3d 479 (2d Cir. 2019) ..............................................................12

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975)...........................................................................12

*Pierce Cty., Wash. v. Guillen*,
    537 U.S. 129 (2003)...........................................................................44

*Prison Legal News v. Exec. Off. for U.S. Att'ys*,
    No. 08-cv-01055–MSK–KLM, 2009 WL 2982841 (D. Colo. Sept. 16, 2009) ...36

*Prison Legal News v. Exec. Off. for U.S. Att'ys*,
    628 F.3d 1243 (10th Cir. 2011) .........................................................36

*Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*,
    3 F.4th 350 (D.C. Cir. 2021)..............................................................43

*Schladetsch v. Dep't of Hous. & Urb. Dev.*,
    No. 99-0175, 2000 WL 33372125 (D.D.C. Apr. 4, 2000) ........................... 26, 40

*Stahl v. Dep't of Just.*,
    No. 19-cv-4142 (BMC), 2021 WL 1163154 (E.D.N.Y. Mar. 26, 2021) ............35

*Stone v. INS*,
514 U.S. 386 (1995)............................................................................44

*Students Against Genocide v. Dep't of State*,
257 F.3d 828 (D.C. Cir. 2001)............................................................39

*Trans-Pac. Policing Agreement v. U.S. Customs Serv.*,
177 F.3d 1022 (D.C. Cir. 1999).................................................... 32, 33

*Tunnell v. U.S. Dep't of Def.*,
No. 1:14-cv-00269-SLC, 2016 WL 5724431 (N.D. Ind. Sept. 30, 2016)............36

*U.S. Dep't of State v. Ray*,
502 U.S. 164 (1991)............................................................................45

*United States Dep't of Justice v. Tax Analysts*,
492 U.S. 136 (1989).................................................................... 17, 18

*WP Co. LLC v. U.S. Small Bus. Admin.*,
No. 20-1240 (JEB), 2021 WL 2982173 (D.D.C. July 15, 2021).........................30

*Yeager v. Drug Enf't Admin.*,
678 F.2d 315 (D.C. Cir. 1982)...................................................... 18, 38

**Statutes**

5 U.S.C. § 552(a)(3)(B) .................................................................. 13, 19

5 U.S.C. § 552(a)(3)(C) ......................................................................19

5 U.S.C. § 552(a)(3)(D) .................................................................. 13, 19

5 U.S.C. § 552(a)(4)(B) ....................................................................2, 17

5 U.S.C. § 552(a)(8)(A)(i) ...................................................................43

5 U.S.C. § 552(a)(8)(A)(ii)(II) ........................................................ passim

5 U.S.C. § 552(b) ............................................................................. passim

5 U.S.C. § 552(b)(1)–(9) ........................................................................12

5 U.S.C. § 552(b)(6) ...............................................................................6

5 U.S.C. § 552(b)(7)(C) ..........................................................................6

5 U.S.C. § 552(f)(2) ..............................................................................21

5 U.S.C. § 552(f)(2)(A) ................................................................... 13, 19

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................2

## Legislative Materials

Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, 110 Stat. 3048 (1996) ................................................... 12, 21, 29

FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 (2016) ...................................................................... passim

H.R. Rep. No. 104-79 (1996) ............................................. 13, 19, 22, 38

S. Rep. No. 104-272 (1996) ...................................................................25

S. Rep. No. 114-4 (2015) ................................................................ passim

## Other Authorities

Fed. R. App. P. 4(a)(1)(B) ......................................................................3

Oxford English Dictionary (2d ed. 1989) ..................................................19

The Merriam-Webster.com Dictionary....................................................42

# INTRODUCTION

This case involves a simple question: Does the Freedom of Information Act ("FOIA") require Appellee U.S. Immigration and Customs Enforcement ("ICE") to disclose information that it has created, maintains in its databases, and can easily produce using an automated process that the agency itself has conceded imposes no legally cognizable burden? Case law, common sense, and the FOIA statute itself all dictate that the answer must be "yes." The district court, however, concluded otherwise, ruling that disclosure of this information entails record creation not mandated by FOIA. This Court should reverse.

Appellant American Civil Liberties Union ("ACLU") seeks information about ICE's enforcement operations. It requested that responsive information be organized in spreadsheets, and that the Alien Numbers assigned to individual noncitizens in the immigration system, which include personally identifying information, be replaced with anonymous unique identifiers so that the public— just like ICE—can understand the movement of noncitizens across the different stages of the enforcement process, from arrest to detention to deportation or release. ICE refused, instead redacting the Alien Numbers and thereby withholding crucial, nonexempt information. Analogizing to paper records, it is as if ICE carefully maintained separate file folders for each individual, but chose to jumble

1

everyone's records together when it came time to provide information to the public under FOIA.

The district court ruled that ICE was not obligated under FOIA to substitute unique identifiers for A-Numbers because doing so would constitute the creation of a new record, something that FOIA does not require. But that ruling—which allows ICE to produce a jumbled mass of data—leads to absurd results and nullifies FOIA in the digital age. Agencies maintain extensive information in databases relevant to all aspects of peoples' lives. If the nonburdensome arrangement and extraction of that preexisting information were record creation, then much of the government's operations could be forever shielded from the public, frustrating FOIA's fundamental purposes of transparency and oversight. Here, ICE maintains information that links different records in its databases as relating to the same person, and concedes that applying an automated script to provide that information is a nearly burden-less process. Under FOIA, the agency is obligated to produce it, and this Court should reverse the district court's ruling to the contrary.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. On March 10, 2021, the district court granted ICE's motion for summary judgment and denied the ACLU's cross-

motion. It entered judgment for ICE the same day. JA191. The ACLU timely filed

a notice of appeal on May 5, 2021. *See* Fed. R. App. P. 4(a)(1)(B); JA192. This

Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether FOIA allows ICE to withhold nonexempt information that it

created, maintains, and can access in its databases, and which it can disclose

without material burden by substituting unique identifiers for exempt Alien

Numbers.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.    The FOIA Request and ICE's Response

On October 3, 2018, the ACLU filed a FOIA Request ("Request") seeking

information about ICE's enforcement activities. ICE is the federal agency charged

with implementing the immigration enforcement process, from arrest to

deportation. The Request sought spreadsheet data pertaining to five aspects of the

deportation process: arrests, risk classification assessments, detentions, bonds, and

removals. JA008–011. The purpose of the Request was to inform the public about

the impact of the federal government's (then new) enforcement priorities, which

were aimed at expanding immigration detention, limiting release on bond, and

increasing removals of noncitizens without criminal records. JA012.

To better understand how ICE was implementing these enforcement priorities, the ACLU sought information about how people moved through the various stages of the deportation process. Thus, a critical part of the requested information was the *relationship* between data points: that, for instance, a particular detention decision and a particular removal decision pertained to the same person. This would allow the public to analyze, for example, whether individuals who are detained in certain parts of the country are more likely to be deported, or whether those taken into custody from local jails are more likely to be detained pending their immigration proceedings than those arrested during ICE raids.

ICE maintains two databases, each of which contains the information the ACLU seeks. The Enforcement Integrated Database ("EID") is ICE's master database. It stores all records relating to enforcement actions taken against noncitizens, including data relating to each noncitizen's arrest, detention, and deportation. Vassilio-Diaz Decl. at JA037–038 ¶¶ 6, 8. The EID stores data such that all of a noncitizen's enforcement records are linked to that individual's Alien Number ("A-Number").[1] *Id*. at JA038–039 ¶¶ 7, 12. Thus, if ICE searches the

---

[1] A-Numbers are seven- to nine-digit numbers assigned to noncitizens upon the creation of their Alien File ("A-File"), which contains documents relating to an individual's immigration status and is maintained by U.S. Citizenship and Immigration Services ("USCIS"). Each A-Number is unique to a noncitizen. *See* Hausman Decl. at JA077–078 ¶ 7, n.2.

4

database for a particular A-Number, it can pull all records associated with that individual.[2] *Id.* The Integrated Decision Support System ("IIDS") database contains a subset of EID data and also links records via A-Numbers. Vassilio-Diaz Decl. at JA042 ¶ 20. The EID and IIDS, like nearly all modern databases, are relational databases, which means that they store both discrete data points and information about the relationships between those data points. *Id.* at JA037 ¶ 6; Wu Decl. at JA096 ¶ 11 (citing Declaration of Karolyn Miller, *Long v. U.S. Immigr. & Customs Enf't*, No. 1:14-CV-0019-JDB (D.D.C. Oct. 9, 2014) (ECF No. 17-1) ¶¶ 7–11).

A-Numbers maintained in ICE's databases serve two functions. First, they serve as personal identifiers, like social security or driver's license numbers. Vassilio-Diaz Decl. at JA042 ¶ 20. Second, they link together the records that relate to a given individual. *Id.* at JA038–039 ¶¶ 7, 12. When ICE searches its databases for a specific A-Number, it can pull all enforcement records associated with that number. *Id.* at JA039, JA042 ¶¶ 12, 20. It therefore knows whether a particular detention and a particular removal relate to the same person, because the records containing the detention and removal data points are associated with the same A-Number.

---

[2] ICE can also pull this same information by consulting a noncitizen's A-File. Vassilio-Diaz Decl. at JA039 ¶ 12.

Thus, A-Numbers convey two types of information: (1) personally identifying information, and (2) "Relational Information," which links records relating to the same person. Personally identifying information is exempt from disclosure under FOIA so as to protect the privacy of individuals to whom the records relate. *See* 5 U.S.C. § 552(b)(6); (b)(7)(C) (exempting disclosure of information that would result in an "invasion of personal privacy"). Relational Information, however, is *not* exempt because knowing that two records are about the same person does not reveal the identity of that person or invade their privacy.

The Request does not seek personally identifying information, as the identity of a person is not necessary to track what happens to them across the deportation process and to understand the enforcement system. However, Relational Information—knowing that various enforcement actions relate to the *same* (anonymous) person—*does* matter because that information makes it possible to answer basic quantitative questions, such as how frequently a certain type of arrest leads to detention or deportation. The ACLU thus seeks Relational Information— which is not exempt under FOIA, and thus presumptively must be disclosed under the statute—but not personally identifying information.

The ACLU requested that ICE produce the data in any electronic spreadsheet format. Recognizing the privacy interests at stake, it did not seek any personally identifying information, including A-Numbers. Instead, it requested that

6

ICE replace A-Numbers with anonymous unique identifiers ("Unique IDs"), as the agency had done in past productions.[3] A Unique ID is a string of randomly-generated numbers that can be automatically swapped in for an A-Number, allowing the spreadsheets to indicate which pieces of information concern the same person without disclosing that person's identity. Each Unique ID corresponds to a different A-Number. Unique IDs link records associated with the same person without requiring disclosure of exempt personal information.

ICE could have relayed Relational Information without creating Unique IDs. For example, if all the data that the ACLU requested had been provided in a single spreadsheet, with each row corresponding to a particular individual, then ICE would have disclosed the requested Relational Information without need for an A-Number or Unique ID. But ICE did not provide the data in that format.[4] Instead, ICE produced five sets of spreadsheets corresponding to the categories of data requested, *i.e.* arrests, risk classification assessments, detentions, bonds, and removals. Vassilio-Diaz Decl. at JA042 ¶ 19, Ex. A (sample of spreadsheets

---

[3] In response to other FOIA requests, ICE has produced Unique IDs for at least two categories of data, removals and detentions, although it has not previously linked categories of data. *See* Hausman Decl. at JA078–079 ¶¶ 9–11. ICE claimed that it chose to do so as an exercise of discretion. ECF No. 39 at 7–8.

[4] The ACLU requested each category of information linked to a unique identifier because that procedure is easier than producing a single, very large data table. But such a large table would have provided identical information and would have been a sufficient response to the ACLU's request.

produced). Each set of spreadsheets contained a column of A-Numbers. The agency redacted that entire column—withholding both the personally identifying information *and* the Relational Information—rather than segregating and producing the Relational Information by replacing A-Numbers with Unique IDs. It is thus impossible to match information concerning the same individual either across spreadsheets or within the same spreadsheet (where, for example, an individual was detained in more than one detention center). As a result, there is no way to analyze how individuals move through the deportation process. *See* Diagrams 1–3.

**Diagram 1**



*Diagram 1: The arrows depict the Relational Information that ICE has created and can access in its databases. This information conveys the relationship between enforcement records and links them to specific individuals.*

8

**Diagram 2**



*Diagram 2: By redacting A-Numbers from the spreadsheets it produced, ICE stripped them of Relational Information, thereby preventing the ACLU and the public from understanding how the spreadsheets are linked.*

**Diagram 3**

*Diagram 3: Applying a script that substitutes A-Numbers with Unique IDs maintains the nonexempt Relational Information that ICE possesses, but does not disclose exempt personally identifying information conveyed by A-Numbers.*

For example, the arrest spreadsheets indicate whether an arrest took place in

a local jail or in a raid, but without Unique IDs it is impossible to know whether a

9

given individual was later detained or deported, and so it is impossible to determine which type of arrest is more likely to lead to detention or deportation. Similarly, ICE produced data on detention and deportation, but without Unique IDs it is impossible to answer basic questions about the relationship between these two parts of the enforcement process: Are longer periods of detention more or less likely to result in deportation? Do transfers from one detention center to another, which may take detainees away from family and counsel, make deportation more likely? By refusing to take the simple step of substituting Unique IDs, ICE stripped the data of this essential nonexempt information.

ICE's insistence on preventing such analysis of its data is especially striking because substituting Unique IDs imposes no real burden, as the agency itself concedes. *See* ECF No. 39 at 13; Tr. Oral Arg. at JA129:8–18; JA130:17–19. That substitution can be accomplished in a matter of minutes through an automated process. Hausman Decl. at JA083 ¶ 34. Producing Unique IDs involves two steps: (1) write a simple computer script that replaces A-Numbers with Unique IDs and (2) press "run." The script transforms A-Numbers into Unique IDs using information that already exists in ICE's database. No new information is created. Rather, the process strictly deletes the private, exempt information contained in A-numbers.

10

And, notably, the steps involved are the same as the steps involved in creating any spreadsheet from a database, including the spreadsheets that ICE acknowledges it was required to produce. A simple computer script takes information from the database and transforms it so that it can be displayed in an Excel spreadsheet. To illustrate how straightforward and ordinary this process would be, a declarant below wrote a simple script to generate Unique IDs from the spreadsheets that ICE already produced. Writing that script took the declarant, who has no computer science background, roughly three hours. Hausman Decl. at JA082 ¶ 28. When the script is run, in under 22 minutes, it will automatically replace A-Numbers with Unique IDs in the spreadsheets ICE already produced. *Id*. at JA082–083 ¶¶ 30–33.[5] The ACLU provided this script to ICE, and the agency did not contest its ability to use it as described above. *Id*. at JA082 ¶ 29.

## II. Statutory Background

Congress enacted FOIA in 1966 to "pierce the veil of administrative secrecy" that long shielded agency decisionmaking from public scrutiny. *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). FOIA is a "far-reaching statute" that adopts as its most basic premise a strong presumption favoring disclosure. *New York Times Co. v. United States Dep't of Justice*, 939

---

[5] Alternatively, ICE could also quickly produce Unique IDs by running Structured Query Language ("SQL") queries in its databases. *See* Wu Decl. at JA098–101 ¶¶ 20–30.

11

F.3d 479, 488 (2d Cir. 2019). Accordingly, the Act allows the public to access "virtually every document generated by an agency" unless it falls within nine "'clearly delineated'" exemptions. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975) (quoting S. Rep. No. 813, at 3 (1965)); *see also* 5 U.S.C. § 552(b)(1)-(9) (listing exemptions). FOIA's disclosure obligations are to be "construed broadly," while its exemptions must be limited and narrow. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quotation omitted).

Congress has amended FOIA several times to ensure maximum compliance with its broad disclosure mandates. *See* S. Rep. No. 114-4, at 322 (2015) ("Since its enactment, FOIA has been amended multiple times in an effort to improve both transparency and efficiency."). "In 1996 and 2016, Congress amended FOIA to bring it up to date with the digital age." *Lipton v. United States Env't Prot. Agency*, 316 F. Supp. 3d 245, 247 (D.D.C. 2018). Specifically, in 1996, Congress enacted the E-FOIA Amendments to expand the public's access to electronic information in the possession of agencies. *See* Electronic Freedom of Information Act Amendments of 1996, PL 104–231, 110 Stat. 3048 (1996); *see also Aguiar v. Drug Enf't Agency*, 992 F.3d 1108, 1112 (D.C. Cir. 2021). The Amendments introduced a definition of "record"—previously not defined in the statute—as "any *information* that would be an agency record . . . when maintained by an agency in any format, including an electronic format." 110 Stat. 3048, § 3 (codified at 5

12

U.S.C. § 552(f)(2)(A)) (emphasis added). They also provided that agencies shall

produce a record "in any form or format requested . . . if the record is readily

reproducible by the agency in that form or format." *Id*. § 5 (codified at 5 U.S.C. §

552(a)(3)(B)); *see also id*. (codified at 5 U.S.C. § 552(a)(3)(D)) (defining "search"

to include "review, manually or by automated means"). Taken together, these

provisions were enacted to ensure that electronic database records would be subject

to disclosure and that agencies could not "evad[e] the clear intent of the FOIA by

deeming some forms of data as not being agency records" because of the format in

which they were maintained. H.R. Rep. No. 104-795, 20 (1996).

Then, in 2016, Congress again amended FOIA, this time to rein in agencies'

overuse of exemptions to withhold large swaths of information. *See* S. Rep. No.

114-4, at 322 (2015). Importantly, the 2016 FOIA Improvement Act added a new

provision that expanded the obligation of agencies to segregate and disclose

nonexempt information. *See* FOIA Improvement Act of 2016, Pub. L. No. 114–

185, § 2, 130 Stat. 538, 539 (2016) (codified 5 U.S.C. § 552(a)(8)(A)(ii)). Whereas

under the then-existing provision agencies could satisfy the segregation

requirement by "delet[ing] . . . portions [of a record] which are exempt," 5 U.S.C.

§ 552(b), the new provision mandated that they also "take *reasonable steps*

*necessary* to segregate and release nonexempt information . . ." 5 U.S.C. §

552(a)(8)(A)(ii)(II) (emphasis added). Thus, Congress enacted an additional,

13

broader segregability mandate—even though one already existed—to ensure that agencies took affirmative steps to comply with FOIA's "presumption of openness." S. Rep. No. 114-4, at 324 (2015).

## III. The District Court's Opinion

On March 10, 2021, the district court granted ICE's motion for summary judgment. It adopted ICE's position that, because Relational Information is not a "preexisting data field[]" in the agency's database, it is not a record subject to FOIA disclosure. Op. at JA185. The district court held that Unique IDs and the Relational Information they convey are "conceptual abstractions," and substituting Unique IDs for A-Numbers would entail creation of a new record. *Id*. at JA185–186. The district court further held that ICE is not required to apply a computer script to A-Numbers to segregate out nonexempt Relational Information from exempt personally identifying information. *Id*. at JA187–188. The court opined that agencies are not obligated to produce "'information in the abstract'" and "ICE cannot be compelled to segregate what does not already exist." *Id*.

In reaching this conclusion, the district court did not explain why Relational Information—existing data that groups records concerning the same individual—is any more abstract or nonexistent than other digital information subject to disclosure under FOIA. The court also did not engage with the text, structure, or history of the 1996 E-FOIA Amendments or the 2016 FOIA Improvement Act. Op.

14

at JA181, JA184–187. Nor did it consider the minimal time and effort required to

replace A-Numbers with Unique IDs. *Id.* at JA188, n.6.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's ruling for two independent

reasons: First, the nonexempt Relational Information that ICE created and

maintains in its databases is a record subject to disclosure under FOIA—not a

"conceptual abstraction," as the district court found. Second, segregating

nonexempt Relational Information through the nonburdensome and automated

replacement of exempt A-Numbers with unique identifiers does not require the

creation of a new record and is mandated by FOIA's robust segregability

principles.

First, Relational Information is a "record" subject to disclosure under FOIA

because ICE creates, maintains, and can access this information in its databases.

ICE created Relational Information by deciding to link A-Numbers to a

noncitizen's enforcement records, and it can easily access it without engaging in

additional research or analysis. This conclusion is supported by the 1996 E-FOIA

amendments, which established that "record" was to be construed broadly to

encompass "*information*" maintained by agencies, regardless of the format in

which it was stored. Courts applying E-FOIA's provisions have held that

extracting and sorting preexisting information in agency databases does not

constitute record creation. Relational Information is nothing more than preexisting information connecting records to specific individuals, and ICE must disclose it under FOIA.

Second, ICE has an independent obligation under FOIA to disclose Relational Information because it is nonexempt information that can be segregated from exempt A-Numbers. Longstanding FOIA principles confirm that the methods agencies must use to segregate nonexempt information depend on the format in which records are stored. This flexible segregation mandate means that, in the context of Relational Information stored in ICE's databases, producing Unique IDs to "delete" exempt information from A-Numbers is an appropriate, nonburdensome method of segregation. *See* 5 U.S.C. § 552(b). That ICE is mandated to take such "reasonable steps" to segregate and release nonexempt information is further confirmed by the plain text, context, and history of a 2016 amendment to FOIA. *Id*. (a)(8)(A)(ii)(II). To construe production of Unique IDs as record creation, as the district court did, would incentivize agencies to link nonexempt information to exempt data points, thereby preventing disclosure of important information maintained in databases and undermining the fundamental principles of transparency undergirding FOIA.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment in FOIA litigation *de novo*. *Ctr. for Constitutional Rights v. CIA*, 765 F.3d 161, 166 (2d Cir. 2014); *accord* 5 U.S.C. § 552(a)(4)(B). "[W]here the question is whether requested documents are 'agency records' subject to disclosure under FOIA, '[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records.'"" *Grand Cent. P'ship, Inc.*, 166 F.3d at 478 (quoting *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)). The government also bears the burden of establishing that any claimed exemption applies, *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005), and that the information withheld is not further segregable. *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260–62 (D.C. Cir. 1977).

## ARGUMENT

### I. Relational Information is a "Record" Subject to Disclosure Under FOIA.

Relational Information—the link between records that indicates they are about the same person—is information that ICE possesses, and it is a record subject to disclosure under FOIA. "Record" is defined broadly under FOIA, and the 1996 E-FOIA Amendments confirmed that *information* maintained in agency databases is subject to disclosure. For "information" to be an "agency record," the

17

agency must (1) "either create or obtain" the requested information, and (2) "be in control" of it at the time of the FOIA request. *Grand Cent. P'ship*, 166 F.3d at 479 (citing *Tax Analysts*, 492 U.S. at 144–45). ICE creates, maintains, and is in control of Relational Information in its databases. In choosing to link noncitizens' enforcement records with their A-Numbers, ICE "has in fact chosen to create and retain" Relational Information, which it regularly and necessarily accesses. *Yeager v. Drug Enf't Admin.*, 678 F.2d 315, 321 (D.C. Cir. 1982); *see also* Vassilio-Diaz Decl. at JA039 ¶ 12. ICE can retrieve this information by searching its databases and pulling, for example, the arrest, detention, and removal data connected with a single individual. Vassilio-Diaz Decl. at JA038, JA039 ¶¶ 7, 12. Thus, Relational Information is a record that ICE must disclose under FOIA.

A. The Requested Relational Information Is An Existing Agency "Record" Under The E-FOIA Amendments.

The district court acknowledged that Relational Information is "*information*," but concluded that it is a "conceptual abstraction[]" and therefore not a "record" subject to disclosure under FOIA. Op. at JA185–186 (emphasis added). This holding contradicts the letter and intent of the 1996 E-FOIA Amendments and fundamentally misunderstands how databases store information. The E-FOIA Amendments specifically required agencies to make electronic records more readily accessible under FOIA. *See Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 403 F. Supp.

18

3d 343, 348 (S.D.N.Y. 2019), *rev'd and remanded on other grounds*, 984 F.3d 30 (2d Cir. 2020); *see also* 5 U.S.C. § 552(a)(3)(B)–(D). Critically, by defining "records" as "any *information* that would be an agency record . . . when maintained by an agency in any format," 5 U.S.C. § 552(f)(2)(A) (emphasis added), Congress sought to ensure that "[n]o matter how it is preserved," once an agency creates and maintains information, that information constitutes a "record" subject to disclosure under FOIA. H.R. Rep. No. 104-795, at 20 (1996).

There can be no doubt that Relational Information is just that— "information"—as the district court recognized. Op. at JA187. The E-FOIA Amendments do not define "information," but its ordinary meaning is expansive. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019) (noting that, when no statutory definition is provided, courts look to the "ordinary, contemporary, common meaning" of the words when the statute was enacted). The edition of the Oxford English Dictionary most contemporaneous to E-FOIA's enactment defines "information" as "[k]nowledge communicated concerning some particular fact, subject, or event; that of which one is apprised or told . . . ." Information, Oxford English Dictionary (2d ed. 1989), https://www.oed.com/oed2/00116500 (last visited Aug. 20, 2021). And "knowledge" concerning a particular fact can be communicated in many ways; it need not be reduced to a discrete document, spreadsheet column, or data point. It

19

can also be communicated by observing, for instance, how files are organized within a cabinet, how books are arranged on a bookshelf, or how many entries are in a particular column of a spreadsheet.

Here, ICE's databases contain information about how different pieces of information are linked together—*i.e.*, that certain data points concern the same individual. Thus, when ICE searches its databases for a specific individual, it can pull up the arrest, detention, and deportation data linked with that person. Vassilio-Diaz Decl. at JA039, JA042 ¶ 12, 20. In other words, the search results communicate to the user the fact that certain data points are linked with each other and that they all relate to a particular individual. ICE *already* possesses that "information" and can access it at any time by searching its databases.

The Request simply seeks public access to this already-existing information, arranged in a manner that the agency itself decided to organize it. As one court recently explained:

> To analogize to a paper records system, if ICE kept records of detainers and records of removals in separate drawers with separate subfolders, but both sets of records were clearly marked with individual aliens' names or identifying numbers such that a particular alien's detainer and removal records could be readily matched without any further research or analysis, merely putting those records together and producing them to Plaintiffs likely would not constitute "record creation" under FOIA.

*Long v. United States Immigr. & Customs Enf't*, No. 5:17-cv-00506, 2020 WL 5994182, at *12 (N.D.N.Y. Oct. 9, 2020). In seeking Relational Information, the

20

ACLU asks ICE to effectively "merely put records together" so that it can trace the enforcement history of individual (anonymous) noncitizens. Indeed, producing Relational Information as requested here would involve significantly *less* effort than grouping sheets of paper. *See supra*, Statement of Facts, Part I. And the E-FOIA amendments make clear that this associational information, "when maintained by an agency in any format"—including in a database—is no less a "record" subject to disclosure. 5 U.S.C. § 552(f)(2) (defining "record" as "any *information*" maintained by an agency) (emphasis added). The agency's FOIA obligations are no different just because the information must be retrieved from a database—the dispositive fact is that the agency created and maintains the information to begin with. *See Ctr. for Investigative Reporting v. United States Dep't of Just.*, 982 F.3d 668, 691–92 (9th Cir. 2020) (holding that an agency's ability to access information in a particular configuration is sufficient to show that it is a record subject to disclosure under FOIA).

Construing FOIA to exclude Relational Information contradicts Congress's purpose in enacting the statute. Pursuant to the E-FOIA amendments, agencies were to "use new technology to enhance public access to agency records" and "maximize the usefulness" of these records for requestors. 110 Stat 3048, § 2(a)(6); *id*. (b)(4). As computer technology revolutionized how agencies stored and processed records, Congress sought to bring the "massive amounts of information

21

on electronic networks and in electronic databases" within FOIA's purview. *Ctr. for Investigative Reporting*, 982 F.3d at 690 (citing H.R. Rep No. 104-795, at 11 (1996)). It enacted the amendments with the understanding that "FOIA would apply to 'yet-to-be invented technologies'" and "evolving practices of data storage and use" would require an expansive definition of "records." *Aguiar*, 992 F.3d at 1109 (quoting H.R. Rep. No. 104-795, at 20 (1996))). "Without question, [FOIA] is broadly conceived," and construing "records" to encompass *information* maintained in agency databases best fulfills Congress's desire to promote broad access to government information. *Env't Prot. Agency v. Mink*, 410 U.S. 73, 80 (1973). Taken together, the text and purpose of E-FOIA make clear that "records" include information contained in a database. *Cf.* Op. at JA185 (finding that Relational Information not a record because it is not a "preexisting data field[]" in ICE's database).

B.  Extracting Relational Information, Like Other Compilations And Arrangements Of Data Maintained in Agency Databases, Is Not Creation Of A "New Record."

As explained above, the Relational Information the ACLU seeks is an existing agency record subject to disclosure under the FOIA. The district court held otherwise, opining that the ACLU's request for Relational Information "doesn't seek the contents of [ICE's] database," but instead seeks "information *about* those contents" and, "[a]s such, it is a request that requires creation of a new record." Op.

22

at JA185 (emphasis added). That is incorrect. Relational Information is an essential part of the information stored *in* ICE's databases, and available to the agency; indeed, without Relational Information connecting pieces of information to the same individual, the database would be of little value. And consistent with the 1996 E-FOIA amendments' text and purpose, courts routinely require the disclosure of information that agencies possess in databases, even when doing so involves arranging or compiling preexisting data points in order to disclose the existing information. This Court should do the same here.

For example, in *Center for Investigative Reporting*, the Ninth Circuit recently rejected precisely the logic on which the district court relied below. There, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") argued that, in seeking aggregate data about the "total number of weapons traced back to former law enforcement ownership," the plaintiff "did not request trace records themselves, but statistical information *about* those records that does not already exist in the [agency's] database." *Ctr. for Investigative Reporting*, 982 F.3d at 690, 678, 692. According to ATF, because it did not maintain the requested aggregate counts in its database, compiling them constituted record creation. *Id*. at 690.

The Ninth Circuit disagreed. It explained that extracting "a particular arrangement or subset of data already maintained in an agency's database does not amount to the creation of a new record." *Id*. at 691. It grounded this holding in the

23

text and purpose of the E-FOIA Amendments and "common sense," explaining that "[u]nlike paper documents, which present information in a largely fixed form," databases contain "a multitude of different arrangements of the data, each of which is in the agency's possession or control." *Id.* at 692 (cleaned up). "The agency has access to these different arrangements of data, and under E-FOIA, the public presumably has the same rights of access." *Id.*

The ACLU is asking for even less here. Its request was for a "particular arrangement" of data points that ICE created and stores in its databases: namely, arrest, detention, and deportation data, and information about how they are associated with particular individuals. That information, unlike the aggregate data in *Center for Investigative Reporting, already exists in ICE's databases*, and the agency can easily retrieve it at will by querying its databases. *See* Vassilio-Diaz Decl. at JA039 ¶ 12 (officers can "pull data related to an individual from the EID using a separate software application," "one at a time," with a "specific personal identifier, such as an A-Number"). The agency can extract and produce Relational Information in the same way that it extracted relevant information to produce the spreadsheets at issue in this Request. ICE created Relational Information in its database when it chose to link enforcement records with personal identifiers, and the public has a right to access this information under FOIA. *Ctr. for Investigative Reporting*, 982 F.3d at 692.

24

That ICE may need to aggregate and compile Relational Information in order to produce it is "not a basis for concluding that the request asks the agency to go beyond its FOIA obligations." *Everytown*, 403 F. Supp. 3d at 357; S. Rep. No. 104-272, at 29 (1996) (retrieving information from a database "may result in the creation of a new document when the data is printed out," but this may be "the only way in which computerized data is retrievable, even if it means that a new document is created"). Not only have courts required this kind of aggregation and compiling in the specific context of electronic databases, but they have long seen similar efforts as a standard practice under FOIA. *See, e.g.*, *Disabled Officer's Ass'n v. Rumsfeld*, 428 F. Supp. 454, 456 (D.D.C. 1977), *aff'd,* 574 F.2d 636 (D.C. Cir. 1978) ("The fact that defendants may have to search numerous records to comply with the request and that the net result of complying with the request will be a document the agency did not previously possess is not unusual in FOIA cases nor does this preclude the applicability of the Act.").

Other courts applying E-FOIA's provisions agree that "sorting, extracting, and compiling pre-existing information from a database does not amount to creation of a new record." *Ctr. for Investigative Reporting.*, 982 F.3d at 691; *see, e.g., Long v. CIA*, No. 15-cv-1734, 2019 WL 4277362, at *4 (D.D.C. Sept. 10, 2019) (compiling records of "certain data fields that the CIA concedes exist within the database" did "not constitute the creation of a new record"); *Long v. United*

25

*States Immigr. & Customs Enf't*, 2020 WL 5994182, at *10 (similar); *Schladetsch v. Dep't of Hous. & Urb. Dev.*, No. 99-0175, 2000 WL 33372125, at *3 (D.D.C. Apr. 4, 2000) ("extracting and compiling" "discrete pieces of information" that exist in agency's database "does not amount to the creation of a new record"); *Everytown*, 403 F. Supp. 3d at 359, *rev'd on other grounds*, 984 F.3d 30, 44 (2d Cir. 2020) ("producing aggregate data or other descriptive information about an agency database" does not constitute record creation if such information is "apparent on the face of a database when the searches required by FOIA are conducted"). So too here. Requiring ICE to search and "sort [its] database by a particular data field," such as A-Number, and produce the resulting arrangement of data falls within the scope of its disclosure obligations. *Everytown*, 403 F. Supp. 3d at 356 (S.D.N.Y. 2019).

C. Producing Relational Information Does Not Require ICE To Conduct Additional Research Or Analysis.

There are, of course, limits to what constitutes a "record" in the context of database information. Extracting existing information from a database constitutes record creation when doing so calls for agency personnel to add substantively to the information requested, through research or "significant human analysis," not when the request calls simply for the disclosure of preexisting, nonexempt information. *Ctr. for Investigative Reporting*, 982 F.3d at 693; *see also Everytown*, 403 F. Supp. 3d at 359 (explaining that, after the E-FOIA Amendments, whether

database information constitutes an existing record "hinges not on whether the information is housed in the form requested," but on whether the agency will have to "engage in additional research or conduct additional analyses above and beyond the contents of its database" to produce it).

In ruling that disclosing Relational Information requires creation of a new record, the district court relied heavily on a single D.C. district court decision that held that producing a listing of records, as opposed to the records themselves, involves record creation because the list did not exist prior to the request. *See Nat'l Sec. Couns. v. Cent. Intel. Agency*, 898 F. Supp. 2d 233, 271 (D.D.C. 2012). But critically, the D.C. Circuit, in a subsequent opinion in the same case, did not adopt this reasoning, instead emphasizing the burden of *analysis* that would be imposed on the agency. *See Nat'l Sec. Couns. v. Cent. Intel. Agency*, 969 F.3d 406, 409 (D.C. Cir. 2020). The plaintiff in that case sought a listing of all FOIA requesters during a two-year period, organized by the fee category to which they were assigned. *Id.* The D.C. Circuit held that the CIA was not required to produce this listing because complying with the plaintiff's request would have required agency analysts to "individually review . . . and manually sort thousands of requests based on fee category." *Id*. In other words, the request was seeking analysis of existing

information—not the information itself.[6] Here, by contrast, Relational Information *does* exist in ICE's databases and is easily accessible. Vassilio-Diaz Decl. at JA038–039, JA042 ¶¶ 7, 12, 20. Retrieving this arrangement of data requires no extrinsic knowledge or burdensome analysis by the agency. Indeed, the spreadsheets ICE produced contain this information, but ICE has redacted it by deleting A-Numbers and not providing substitute Unique IDs. Moreover, as explained below, *see infra* Part II.C, producing this information requires minimal effort by the agency.

To adopt the sweeping reasoning advanced by the district court would be to "render FOIA a nullity in the digital age." *Ctr. for Investigative Reporting*, 982 F.3d at 692. In holding that ICE is required to disclose only that information which the agency *itself* has already decided to store as a "preexisting data field" or organize into a spreadsheet, the district court's opinion would allow agencies to turn over only those arrangements of information that they have already extracted from their databases, or to run only a limited number of pre-set queries, and thereby control and severely limit the nonexempt information they release to the public. Op. at JA185. Not only would this prevent disclosure of Relational

---

[6] The D.C. Circuit explicitly declined to consider "whether sorting a database by field" or "disclosing the results of an electronic search" would "involve the creation of new records," affirming instead on the narrower grounds stated above. *Nat'l Sec. Couns*, 969 F.3d at 409.

Information about the associations between records, but it would also shield from disclosure aggregate counts, lists and indexes, and other arrangements of data that convey important information in an agency's possession and are accessible to it at any time, but that the agency simply has not already chosen to distill into a particular format. Rather than encouraging the use of database technology to "enhance public access to agency records," the district court's holding would promote the exact opposite. 110 Stat 3048, § 2(a)(6). Such perverse outcomes would frustrate the transparency and accountability goals of FOIA and should be rejected. Relational Information is an existing agency record, and the district court wrongly concluded that the Request called for the creation of a new record.

## II.     FOIA Requires ICE to Segregate Nonexempt Relational Information from A-Numbers.

Relational Information is also subject to disclosure because it is nonexempt information conveyed by A-Numbers that ICE is required to segregate and produce under FOIA. Relational Information can be segregated from A-Numbers through the application of a script that automatically deletes personally identifying information by substituting Unique IDs for A-Numbers. The Unique IDs function in much the same way that black redaction marks do in documents: they conceal personally identifying information but retain nonexempt Relational Information that is key to understanding the movement of people through the deportation process. ICE has conceded that this method of segregation imposes nearly no

29

burden. Under longstanding principles of FOIA segregation, the agency must utilize Unique IDs to segregate and produce Relational Information.

A. <u>The District Court's Refusal To Require Segregation Contravenes Settled FOIA Principles.</u>

FOIA directs agencies to disclose "[a]ny reasonably segregable portion of a record" after "deletion" of exempt portions. 5 U.S.C. § 552(b). Here, as previously explained, A-Numbers convey both nonexempt, segregable Relational Information and exempt personally identifying information. *See supra*, Statement of Facts, Part I. In redacting the entire A-Number column, ICE impermissibly deleted both exempt personally identifying information *and* nonexempt Relational Information from the spreadsheets it produced. *See Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 677–78 (D.C. Cir. 2016) (noting that "in expressly allowing for—and only for—'deletion of the portions' of a responsive record 'which are exempt,' . . . the statute reinforces the absence of any authority to delete portions of a responsive record which are *not* exempt") (quoting 5 U.S.C. § 552(b)); *WP Co. LLC v. U.S. Small Bus. Admin.*, No. 20-1240 (JEB), 2021 WL 2982173, at *10–11 (D.D.C. July 15, 2021) (rejecting agency's decision to "withhold the entire data field" in light of its failure to explain why it could not segregate the nonexempt portion of the information). The district court, however, refused to require ICE to segregate and produce Relational Information. Op. at JA187–88. That was error.

30

It is well established that FOIA contains a robust mandate to agencies to segregate exempt from nonexempt information, and disclose nonexempt portions of relevant records. "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data*, 566 F.2d at 260. FOIA "does not provide for withholding responsive but non-exempt records or for redacting nonexempt information within responsive records." *Am. Immigr. Laws. Ass'n*, 830 F.3d at 677.

These principles apply with equal force to information stored in electronic databases. Just as agencies must conduct a "line-by-line review" of documents to ensure nonexempt information is segregated, so too must data be reviewed for segregable information. *See Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002); *see also Long v. United States Immigr. & Customs Enf't*, 464 F. Supp. 3d 409, 423–25 (D.D.C. 2020) (requiring ICE to conduct segregability analysis of information stored in its databases); *Ayuda, Inc. v. Fed. Trade Comm'n*, 70 F. Supp. 3d 247, 276 (D.D.C. 2014) (similar).

An agency can only avoid the segregation requirement if nonexempt portions of a record are "inextricably intertwined" with exempt portions, *Hopkins v. U.S. Dep't of Housing and Urban Dev.*, 929 F.2d 81, 86 (2d Cir. 1991) (internal quotation marks omitted), "such that the excision of exempt information would

31

impose significant costs on the agency and produce an edited document with little informational value." *Neufeld v. IRS*, 646 F.2d 661, 666 (D.C. Cir. 1981); *see also Cook v. Nat'l Archives & Recs. Admin.*, 758 F.3d 168, 178 (2d Cir. 2014) (similar). Here, Relational Information will provide valuable insight into how various aspects of the deportation process are linked. ICE cannot shield this important information from the public by embedding it in exempt personal identifiers, such as A-Number, and then refusing to segregate it.

The D.C. Circuit's decision in *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022 (D.C. Cir. 1999), illustrates this bedrock segregation requirement. There, appellants requested the first four or six digits of a ten-digit shipping code so that they could track the shipment of cargo in sealed containers. *Id*. at 1026–27. Each digit in the code added "an additional layer of specificity to the description of goods." *Id*. at 1024. The U.S. Customs Service claimed that the entire code was exempt and refused to segregate the first few digits. The D.C. Circuit disagreed, holding that plaintiffs had raised a "plausible claim" that the shipping codes are "'records' subject to segregability under FOIA" and remanded for the district court to determine if the agency should be required to disclose "four or six digits of each [ten-digit] number, and segregate[] out the remaining digits that provide . . . confidential information." *Id*. at 1026–27. Similarly, as explained above, Relational Information is conveyed by A-Numbers, and just as the shipping

32

codes in *Trans-Pacific* could be segregated into smaller units of information that conveyed additional meaning, so too can A-Numbers be segregated into Relational Information and personally identifying information. The district court therefore should have required ICE to do so.

B. FOIA's Flexible Segregation Mandate Requires Use Of Unique IDs To Produce Relational Information.

The district court may have so erred because producing Unique IDs appears, on the surface, different from traditional redaction of written materials. If so, it badly misunderstood FOIA's segregation mandate, which is flexible as well as robust.

As an initial matter, although the method used to segregate database information (applying a script) differs from the line-by-line redaction that would be applicable to documents, the goal and outcome is the same. *See Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 587 (D.C. Cir. 2020) (finding that redaction technique used to segregate video footage "would meet the same sort of segregability standards typically applied to printed material"). The A-Number is akin to a single document that contains some sentences that are exempt (personally identifying information) and other sentences that are not exempt (Relational Information). Applying a black redaction mark to the exempt sentences serves the same purpose as running a computer script that substitutes Unique IDs for A-Numbers. Whereas on the document deletions are indicated by redaction marks

33

that conceal exempt information, in the context of spreadsheet data, deletions are indicated by Unique IDs that conceal personally identifying information. Unique IDs are thus the functional equivalent of black redaction marks. *See, e.g., Hawkinson v. Immigr. & Customs Enf't.*, No. CV 20-10189-FDS, 2021 WL 3604845, at *14 (D. Mass. Aug. 12, 2021) (suggesting that "substituting names for a unique identifier" is "arguably [] a method of redaction").  Ordering the agency to engage in this method of segregation, which is properly tailored to the particular digital format in which ICE maintains these records, was amply warranted by FOIA.

Indeed, the methods agencies must apply to meet their segregation obligations vary significantly depending on the format in which the requested nonexempt information is stored. *See Mead Data*, 566 F.2d at 261 (noting that "segregability depends entirely on what information is in a document and how it is presented"). Agencies are required to focus on the "nature of the information" requested and divide records into "parts that are exempt and parts that are not exempt, based on the kind of information contained in the respective parts." *F.B.I. v. Abramson*, 456 U.S. 615, 626 (1982).

Consistent with these principles, courts mandate a wide range of segregation methods. Recently, for example, in *Evans v. Fed. Bureau of Prisons*, 951 F.3d at 587, the D.C. Circuit confronted claims by the Bureau of Prisons that it could not

34

segregate nonexempt portions of a prison surveillance video while protecting the privacy interests of prisoners whose identities were exempt from disclosure. The court rejected the Bureau's claim of non-segregability, and remanded so the agency could explain why it could not use techniques such as "inserting cat faces over the visages of humans" or "blurring out faces" to "eliminate unwarranted invasions of privacy." *Id*. The court suggested that the agency could apply these techniques "either in the video itself or in screenshots." *Id*. In proposing these methods of redaction, the court explained that they "would meet the same sort of segregability standards typically applied to printed material" but were tailored to address the unique features of video recordings. *Id*.

Other courts have applied *Evans*'s "commonsense conclusion" that non-printed material must meet the same segregability standards applicable to paper records. *See, e.g.*, *Stahl v. Dep't of Just.*, No., 19-cv-4142 (BMC), 2021 WL 1163154, at *6 (E.D.N.Y. Mar. 26, 2021). The court in *Stahl* found that "just as defendants could redact an individual's name from a document, they could blur the faces of the medical staff, crop the videos, or even isolate screenshots" to segregate nonexempt information. *Id*. The court acknowledged that "segregating non-exempt information will require some video editing," but held that this fact did not exempt the agency from complying with FOIA's mandates because video editing technology has become "commonplace," "routine[,] and inexpensive." *Id*. at *7.

*See also, e.g.*, *Tunnell v. U.S. Dep't of Def.*, No. 1:14-cv-00269-SLC, 2016 WL 5724431, at *3, 10 (N.D. Ind. Sept. 30, 2016) (requiring agency to blur names and faces and alter voices to protect privacy of military personnel appearing in video); *Prison Legal News v. Exec. Off. for U.S. Att'ys*, No. 08-cv-01055–MSK–KLM, 2009 WL 2982841, at *5 (D. Colo. Sept. 16, 2009), *judgment aff'd, appeal dismissed in part*, 628 F.3d 1243 (10th Cir. 2011) (instructing agency to segregate audio track from video); *Jud. Watch, Inc. v. U.S. Dep't of State*, No. 12-893 (JDB), 2017 WL 3913212, at *5 (D.D.C. Sept. 6, 2017) (isolating portions of a video, either as still photos or video clips, does not constitute record creation).

These cases make clear that FOIA requires segregation of exempt digital information, including by using a variety of different techniques depending on the format of the record. Indeed, running a simple computer script is far less burdensome, complicated, or difficult than the segregation techniques these other courts contemplated. There is thus no merit to the district court's suggestion that Unique IDs must be "created." Op. at JA186–87. Rather, they constitute a proper method of segregation, as at least two courts have noted. *See Mattachine Soc'y of Washington, D.C. v. United States Dep't of Just.*, 267 F. Supp. 3d 218, 228 (D.D.C. 2017) (requiring agency to replace names with "uniquely identifiable" "alphanumeric markers" so that individuals could be "cross-referenc[ed]" across responsive documents); *Hawkinson*, 2021 WL 3604845, at *14 (suggesting that

agency would not be creating a new record by "substituting names for a unique identifier, which arguably is a method of redaction"). Just as replacing human faces with pixels so as to blur the image may be necessary to segregate exempt information in a video, running a script that replaces A-Numbers with Unique IDs is necessary to segregate exempt information from ICE's databases. In order to segregate Relational Information, ICE must adopt a redaction method that conveys the nonexempt arrangement of data but also deletes the exempt personally identifying information conveyed by A-Numbers. Unique IDs are a simple way of accomplishing this, and FOIA required ICE to take this simple step.

C. Using Unique IDs To Segregate Relational Information Is Nearly Burden-Less, and Does Not Constitute Creation Of A New Record.

The district court nevertheless refused to order segregation because, it suggested, this particular method constituted creation of a "new record." Op. at JA185–86. That reasoning was misplaced. As explained above, courts routinely order segregation methods that involve "creation" or "addition"—such as adding cat faces or other methods of video editing. Further, the method requested here does not approach the level of added analysis or burden that courts sometimes find crosses the line into creating a new record.

It is a longstanding principle that complying with FOIA's segregation requirements does not result in record creation. *See, e.g.*, *Long v. U.S. I.R.S.*, 596 F.2d 362, 366 (9th Cir. 1979) (rejecting argument that deleting exempt information

37

creates a new record under FOIA); *Lipton*, 316 F. Supp. 3d at 254 ("It would

defeat the purpose of the segregability requirement if following FOIA's directions

removed a record from FOIA's ambit."). Congress affirmed this principle in the E-

FOIA Amendments as applied to electronic records. *See* H.R. Rep. No. 104-795, at

22 (1996) ("Computer records found in a database rather than in a file cabinet may

require the application of codes or some form of programming to retrieve the

information."). This approach is grounded in common sense and keyed to how

databases function. "Otherwise, it would be virtually impossible to get records

maintained completely in an electronic format, like computer database information

. . . ." *Id.*; *see also Yeager*, 678 F.2d at 321 ("The type of storage system in which

the agency has chosen to maintain its records cannot diminish the duties imposed

by the FOIA.").

Unique IDs are nothing more than a *method* of segregation: They add no

new information, require no human analysis, and can be produced without any real

burden on the agency. They are therefore markedly different from the research and

analysis courts have found to cross the line between production and record

creation. *See, e.g.*, *Aguiar*, 992 F.3d at 1113 (producing maps from GPS

coordinates stored in agency database would "require editorial judgment" and

entail record creation); *ACLU v. Dep't of Justice*, 681 F.3d 61, 66, 71 (2d Cir.

2012) (replacing references to classified information with "alternative language

meant to preserve the meaning of the text" would require agency to "alter[] or modif[y]" record); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 837 (D.C. Cir. 2001) (agency not required to "produce new photographs at a different resolution").

Pressing "run" on a computer script is fundamentally different from creating new maps or images, or analyzing whether neutral phrases adequately preserve the meaning of underlying text while omitting exempt information. Indeed, segregating Relational Information as requested here is an automated process that would require minimal effort or human analysis, as ICE itself has conceded. *See, e.g.*, Tr. Oral Arg. at JA129:8–18; JA130:17–19 (explaining that agency was not "relying on the argument that [producing Unique IDs] is too burdensome under the segrability [sic] requirements"); ECF No. 39 at 13 (asserting that ICE is not required to produce Unique IDs "even if doing so is no more burdensome than a comparable search for records"). *Cf. Flightsafety Servs. Corp. v. Dep't of Lab.*, 326 F.3d 607, 613 (5th Cir. 2003) (holding segregation not necessary where nonexempt information was "so inextricably intertwined with the exempt, confidential information that producing it would require substantial agency resources and produce a document of little informational value"). As explained above, *see supra* Statement of Facts, Part I, once the script is created and run, it automatically segregates Relational Information by producing Unique IDs to replace exempt A-

Numbers.[7] The simple step of producing Unique IDs strictly removes personally identifying information while preserving the Relational Information; it adds no new information, requires no judgment or analysis, and therefore does not create a new record.

Databases have become "commonplace" and are the primary repositories of agency records. *Stahl*, 2021 WL 1163154, at *7. They contain trillions of pieces of data that can be arranged in a myriad of different ways. Retrieving this information necessarily involves applying a script or programming that is capable of extracting and segregating relevant, nonexempt information from all the other exempt or non-responsive information also maintained in that database. If, in the process of extracting the nonexempt information, the script must automatically generate unique identifiers, it cannot be that the production of these identifiers places vast amounts of nonexempt information—information that the agency has created and maintains and has access to—outside the reach of FOIA. To sanction such broad interpretation of "new record" would be to eviscerate FOIA in the digital age and undermine Congress's chief purpose in enacting the E-FOIA Amendments. *See*

---

[7] The E-FOIA amendments made clear that generating a script that "extract[s] and compil[es]" the "discrete pieces of information" that an agency possesses in its databases "does not amount to creation of a new record." *Schladetsch*, 2000 WL 33372125, at *3; *see also Everytown*, 403 F. Supp. 3d at 356. The district court disregarded this point because it found that Unique IDs do not exist in ICE's database and are thus new records. Op. at JA185 n.5.

110 Stat. 3048, § 2(a)(6) (agencies should "use new technology to enhance public access to agency records and information").

D.  The 2016 FOIA Improvement Act Placed An Additional Obligation On ICE To Take "Reasonable Steps" To Segregate Relational Information.

The conclusion that ICE is required to produce Unique IDs under FOIA's original segregability provision is further bolstered by Congress's command in the 2016 amendment requiring agencies to "take *reasonable steps necessary* to segregate and release nonexempt information . . . ." FOIA Improvement Act of 2016, Pub. L. No. 114–185, § 2, 130 Stat. 538 (2016) (codified 5 U.S.C. § 552(a)(8)(A)(ii)(II)) (emphasis added). Congress enacted this provision as part of the 2016 FOIA Improvement Act, and it supplemented the existing provision requiring agencies to segregate by "delet[ing] . . . portions which are exempt." 5 U.S.C. § 552(b).

The text of section 552(a)(8)(A)(ii)(II), the context of its enactment, and the history of the 2016 FOIA Improvement Act all confirm that "reasonable steps" requires ICE to produce Unique IDs to segregate Relational Information. The starting point for the construction of any statute, including FOIA, is its plain language. *See Kuzma v. IRS*, 821 F.2d 930, 932 (2d Cir. 1987). A straightforward reading of the old and new segregation provisions demonstrates that the latter is more expansive.

41

The original segregability provision requires agencies to provide "reasonably segregable" portions of a record after "deletion" of exempt portions. 5 U.S.C. § 552(b). To "delete" something is to "eliminate especially by blotting out, cutting out, or erasing." *The Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/deleting (last visited Aug. 19, 2021). With regard to FOIA, then, "deletion" is the "blotting out" or "erasing" of exempt information so that nonexempt information can be segregated and produced. As explained above, courts have interpreted this provision flexibly to encompass different methods of deletion, and it should be read to cover production of Unique IDs.

The provision enacted in 2016 requires agencies to "take reasonable steps necessary" to segregate nonexempt information. 5 U.S.C. § 552(a)(8)(A)(ii)(II). A "step" is "an action, proceeding, or measure often occurring as one in a series." *The Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/step (last visited Aug. 19, 2021). "Steps," while they may include "deletion," also encompass other nonburdensome actions undertaken to segregate nonexempt information. Applying script to database information is thus a "step" undertaken to segregate Relational Information from A-Numbers by replacing them with Unique IDs. And there can be little doubt such a step is "reasonable." Indeed, as explained above, using this method of segregation would

42

be quick and impose essentially no burden on ICE. The plain language of section 552(a)(8)(A)(ii)(II) thus underscores ICE's obligation to produce Unique IDs allowing for the segregation of database information.

The context in which section 552(a)(8)(A)(ii)(II) was enacted provides further support for this reading. Congress included the new segregability provision as part of a broader set of amendments requiring agencies to do more to release nonexempt information. *See* S. Rep. No. 114-4, at 323 (2015) (identifying "growing and troubling trend" of agency reliance on discretionary exemptions "to withhold large swaths of Government information").[8] In amending FOIA's segregability provision to include not only "deletion" but, more broadly, "reasonable steps" Congress sought to curtail this overwitholding of information. *See BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 906 (2019) (Gorsuch, J., dissenting) (the "record of *enacted* changes Congress made to the relevant statutory text over time [is] the sort of textual evidence everyone agrees can sometimes shed light on

---

[8] The provision codifying the "reasonable steps" requirement also included a new requirement that agencies specifically articulate anticipated harm from disclosure when claiming an exemption. *See* 5 U.S.C. § 552(a)(8)(A)(i) (an agency can withhold information "only if (I) [it] reasonably foresees that disclosure would harm an interest protected by an exemption . . . or (II) disclosure is prohibited by law"). This "foreseeable harm" requirement imposed an "independent and meaningful burden on agencies" to articulate the link between "the specified harm and specific information contained in the material withheld." *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 369 (D.C. Cir. 2021) (citations omitted). ICE has failed to demonstrate any foreseeable harm from disclosing the nonexempt Relational Information conveyed by A-Numbers.

43

meaning") (emphasis in original). Thus, "reasonable steps" must be interpreted to give effect to this purpose.

The district court disagreed, asserting in a footnote that the requirements of sections 552(b) and 552(a)(8)(A)(ii)(II) are "coextensive." Op. at JA181 n.4.[9] But construing the new segregability provision as toothless encourages the very agency recalcitrance that Congress sought to curtail through the 2016 amendments and contravenes FOIA's policy of maximum disclosure. Moreover, "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). The district court's finding that "deletion" and "reasonable steps" are "coextensive," Op. at JA181 n.4, violates this basic principle because it fails to "give effect to every clause and word" of the statute. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (internal quotation marks omitted). Such "narrow application" of section 552(a)(8)(A)(ii)(II) will "render Congress's efforts an exercise in futility" and this Court should reject it. *N.Y. Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 221 (2d Cir. 2021) (cleaned up) (citing *Pierce Cty., Wash. v. Guillen*, 537 U.S. 129, 146 (2003)).

---

[9] In reaching this conclusion, it relied on a lower court opinion that summarily concluded that the new provision does not create additional segregation requirements and did not engage with the new text. *See Ctr. For Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 115 (D.D.C. 2019).

Finally, construing section 552(a)(8)(A)(ii)(II) as imposing additional segregability requirements is also consistent with FOIA's purpose to "facilitate public access to Government documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). The Supreme Court has "repeatedly stated" that "[t]he policy of the Act requires that the disclosure requirements be construed broadly." *N.Y. Legal Assistance Grp.*, 987 F.3d at 223 (citing *Rose*, 425 U.S. at 361). And a broad interpretation of section 552(a)(8)(A)(ii)(II) is reinforced by the 2016 amendments, which codified FOIA's presumption of openness and mandated that agencies take affirmative steps for disclosure. *See* S. Rep. No. 114-4, at 322–23 (2015) (amendments "make[] clear that FOIA . . . should be approached with a presumption of openness").

Generating a script and pressing "run" is precisely the type of "reasonable step" mandated by the new segregability provision. It requires minimal effort by ICE and allows for the disclosure of important information maintained in the agency's database. *See supra*, Statement of Facts, Part I. If the district court's contrary interpretation were upheld, other agencies could likewise refuse to take nonburdensome, reasonable steps to provide nonexempt information, an outcome that flies in the fact of the statute's specific command. This narrowing of agency disclosures would be precisely the opposite of what Congress intended vis-à-vis the 2016 FOIA Improvement Act. Rather, the text, context, and history of the 2016

45

amendments confirm that applying a script to segregate nonexempt Relational Information is a "reasonable step" that ICE is required to take.

## CONCLUSION

This Court should reverse the district court's judgment and remand for the court to order production of Relational Information.

Dated: August 20, 2021

Respectfully submitted,
*/s/Noor Zafar*
NOOR ZAFAR
MICHAEL TAN
American Civil Liberties Union
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2660
nzafar@aclu.org

CODY WOFSY
American Civil Liberties Union
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
cwofsy@aclu.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the type-volume limit of Fed. R. App. R. 32 (a)(7)(B)(i) and Local Rule 32.1(a)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,357 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Work in 14-point Times New Roman.

*/s/ Noor Zafar*
Noor Zafar
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2021, I electronically filed Plaintiff-Appellant's Brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the Court's electronic CM/ECF filing system. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/ Noor Zafar*
Noor Zafar
*Counsel for Plaintiff-Appellant*